# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

_____

**No. ACM 39889 (f rev)**

_____

**UNITED STATES**
*Appellee*

**v.**

**Alexander L. DRISKILL**
Airman (E-2), U.S. Air Force, *Appellant*

_____

Appeal from the United States Air Force Trial Judiciary

*Upon Further Review*

Decided 23 August 2022

_____

*Military Judge:* Willie J. Babor; Dayle P. Percle (remand).

*Sentence:* Sentence adjudged on 4 November 2019 by GCM convened at Ramstein Air Base, Germany (20 May 2019), Aviano Air Base, Italy (20–27 June 2019), and Buckley Air Force Base, Colorado (28 October–4 November 2019). Sentence entered by military judge on 2 March 2020, and reentered on 20 January 2022: Dishonorable discharge, confinement for 40 years and 9 months, forfeiture of all pay and allowances, and reduction to E-1.

*For Appellant:* Major Kasey W. Hawkins, USAF; Major Alexander A. Navarro, USAF.

*For Appellee:* Lieutenant Colonel Amanda L.K. Linares, USAF; Lieutenant Colonel Matthew J. Neil, USAF; Major Allison R. Barbo, USAF; Major Alex B. Coberly, USAF; Major Peter F. Kellett, USAF; Mary Ellen Payne, Esquire.

Before KEY, ANNEXSTAD, and MEGINLEY, *Appellate Military Judges*.

Judge ANNEXSTAD delivered the opinion of the court, in which Senior Judge KEY joined. Judge MEGINLEY filed a separate dissenting opinion.

_____

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

_____

ANNEXSTAD, Judge:

At a general court-martial, in accordance with his pleas and pursuant to a pretrial agreement (PTA), a military judge found Appellant guilty of one specification of wrongful possession of obscene cartoons in violation of Article 134, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 934.[1] Contrary to his pleas, a panel of officer members found Appellant guilty of one specification of rape of a child and one specification of sexual abuse of a child, both in violation of Article 120b, UCMJ, 10 U.S.C. § 920b. The members sentenced Appellant to a dishonorable discharge, confinement for 40 years and 9 months, forfeiture of all pay and allowances, and reduction to the grade of E-1.[2,3] The PTA did not place any limitations on punishment.[4]

Appellant's case is before this court a second time. Although not raised by Appellant, we determined the convening authority had erred by not taking action on Appellant's sentence as required by Executive Order 13,825, § 6(b), 83 Fed. Reg. 9889, 9890 (8 Mar. 2018), and Article 60, UCMJ, 10 U.S.C. § 860, *Manual for Courts-Martial, United States* (2016 ed.) (2016 *MCM*), and we remanded his case to the Chief Trial Judge, Air Force Trial Judiciary, for corrective action. *See United States v. Driskill*, No. ACM 39889, 2021 CCA LEXIS

_____

[1] The specifications covered the time period from 11 October 2016 to 27 March 2018. References to the punitive articles of the UCMJ are to the *Manual for Courts-Martial, United States* (2016 ed.). Unless otherwise noted all other references to the UCMJ and the Rules for Courts-Martial are to the *Manual for Courts-Martial, United States* (2019 ed.). Further, the Military Justice Act of 2016, National Defense Authorization Act for Fiscal Year 2017, Pub. L. No. 114-328, §§ 5001–5542 (23 Dec. 2016), as fully implemented by Exec. Order 13,825, 83 Fed. Reg. 9889 (8 Mar. 2018), applied to Appellant's court-martial and post-trial processing.

[2] The military judge merged the specifications of rape of a child and sexual abuse of a child for sentencing.

[3] After trial, the convening authority suspended the adjudged forfeitures of all pay and allowances for six months, release from confinement, or expiration of term of service, whichever was sooner, with suspension commencing on 18 November 2019.

[4] Appellant was credited with 278 days in pretrial confinement.

672, at *11–12 (A.F. Ct. Crim. App. 14 Dec. 2021) (unpub. op.).[5] The convening authority subsequently approved Appellant's sentence, resulting in a new entry of judgment. With this error corrected, we now turn to Appellant's remaining nine issues, along with three additional issues Appellant raised subsequent to our first opinion on this case.

Appellant initially raised nine issues which we have reworded: (1) whether the evidence was legally and factually sufficient to support Appellant's convictions for rape and sexual abuse of a child; (2) whether the military judge abused his discretion by allowing a Government expert to testify about future impact on the named victim; (3) whether the military judge erred when he denied Appellant's request to sever the charge for wrongful possession of obscene cartoons from the charge and specifications for rape and sexual abuse of a child; (4) whether Appellant's conviction for wrongful possession of obscene cartoons violated the prohibition against double jeopardy found in the Fifth Amendment to the United States Constitution[6] and Article 44, UCMJ, 10 U.S.C. § 844; (5) whether the military judge erred by denying Appellant's motion for appropriate relief due to unequal access to the named victim; (6) whether the military judge erred by failing to compel an expert consultant for Appellant; (7) whether Appellant's guilty plea to wrongful possession of obscene cartoons was provident;[7] (8) whether the confinement portion of the sentence was inappropriately severe; and (9) whether Appellant's convictions for rape and sexual abuse of a child were factually and legally insufficient due to errors in the child forensic interview.

After Appellant's record was returned to this court, Appellant raised three additional issues which we have reworded: (10) whether his convictions for rape and sexual abuse of a child were factually and legally insufficient due to bias in the investigation; (11) whether trial counsel committed prosecutorial misconduct during his findings argument; and (12) whether the Government

[5] Our previous decision also addressed one additional issue not raised by Appellant in his initial appeal: whether Appellant was entitled to relief for a facially unreasonable post-trial delay. We found Appellant did not suffer prejudice and that no relief was warranted. *United States v. Driskill*, No. ACM 39889, 2021 CCA LEXIS 672, at *11 (A.F. Ct. Crim. App. 14 Dec. 2021) (unpub. op.).

[6] U.S. CONST. amend. V.

[7] Although Appellant invites us to analyze this issue as one of legal and factual sufficiency, we decline to do so. Appellant pleaded guilty to this offense during his court-martial. In a guilty plea context, the issue is not legal or factual sufficiency, but whether the plea is provident. *United States v. Faircloth*, 45 M.J. 172, 174 (C.A.A.F. 1996).

can prove beyond a reasonable doubt that the military judge's failure to instruct the panel that a guilty verdict must be unanimous was harmless.[8]

With respect to issues (3), (5), (6), and (12), we have carefully considered Appellant's contentions and find they do not require further discussion or warrant relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987). We consider issues (1), (9), and (10) together because they all concern Appellant's contention that his convictions for rape and sexual abuse of a child were legally and factual insufficient.

Finding no error that materially prejudiced a substantial right of Appellant, and following this court's Article 66(d), UCMJ, 10 U.S.C § 866(d), mandate to affirm only so much of the findings and sentence as we find, on the basis of the entire record, should be approved, we affirm the findings. Further, we affirm the sentence, as reassessed by this court, as a result of our ruling on sentence appropriateness.

## I. BACKGROUND

Appellant joined the Air Force in May 2016. At the time of his trial, he was 26 years old. In October 2016, after finishing technical school, Appellant married HD. The couple had a daughter, WD, who had been born in December 2014. After the wedding, Appellant moved to Aviano Air Base, Italy, and was assigned to the 31st Operations Support Squadron. Approximately six months later, in March 2017, HD and WD joined him in Italy.

According to HD's trial testimony, about a year later, in February or March 2018, she and Appellant spent a "really good weekend" together visiting nearby towns in Italy. At the conclusion of the weekend, Appellant went to the couple's bedroom to "tuck [HD] in and say good night." HD testified that for the past couple of months Appellant had been staying up late using his computer on the couch so it had become rare for him to go to bed with her. HD explained that after Appellant hugged her goodnight he said he had "been hiding something from [her] for a while" and that he "couldn't stop looking at little girls." HD was unsure what he meant and asked him to show her what he was talking about. Appellant then walked into the living room with her, retrieved his laptop, and showed her images of child pornography. During the conversation that followed, Appellant admitted to HD that he found the images sexually arousing. In response, HD asked Appellant "if he would ever touch a child, a little girl." Appellant replied "I don't know, because I can't even stop looking" at the images. At this point, HD told Appellant that she would not report or divorce

---

[8] Issues (6), (7), (8), (9), (10) and (11) were personally raised by Appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

him if he immediately got rid of the images and promised her that he would never look at that type of content again. Appellant then took the universal serial bus (USB) drives that contained the child pornography and destroyed them. HD testified she believed Appellant destroyed all the images of child pornography that he possessed.

Later in March 2018, the Air Force Office of Special Investigations (AFOSI) launched an investigation of Appellant. The investigation began when WD, who was almost 3 years old at the time, was diagnosed with herpes.[9] Appellant was interviewed by AFOSI on 27 March 2018. Consistent with the purpose of the investigation and with Appellant's consent, AFOSI agents along with local Italian police officers searched Appellant's home and seized all of his electronic devices, including cell phones, computing devices, and electronic storage devices. These items were then sent to the Defense Cyber Crime Center Cyber Forensics Laboratory (DC3/CFL) for analysis. Ms. MH, a computer forensic examiner at DC3/CFL, discovered obscene cartoons on Appellant's devices. During the *Care*[10] inquiry into the providence of his pleas, Appellant admitted that the images depicted "drawings of characters that are smaller and childlike in nature engaging in sex acts." One image Appellant possessed depicted a young girl on a tricycle, with a penis-shaped dildo in the place of the tricycle seat. Another image depicted a prepubescent girl wearing pigtails. The girl had an adult's penis in her mouth with pubic hair near her face. Behind her, another larger male was holding her leg up, exposing her genitalia. Appellant admitted he did not know how many images he possessed, but agreed it was "well in excess of 100."

In June 2018, while the AFOSI investigation was still ongoing, HD and WD moved to Texas to live with HD's grandparents. During the investigation, HD did not want to talk to investigators or be involved with the investigation. She was satisfied that her husband had destroyed his USB drives containing the indecent images. HD testified that she wanted her "family together, and just have us be happy and not have to worry about it." HD elaborated that although she had physically moved, she still loved Appellant, was trying to work through

---

[9] In October 2017, WD was diagnosed with herpes, known to be a sexually transmitted disease. WD's diagnosis resulted in a referral to Family Advocacy, which eventually led to an investigation by the AFOSI. The court did not factor the issue of WD's herpes diagnosis into our decision. We articulate this information to establish appropriate timelines. No evidence was admitted on this matter and it did not factor into our legal and factual sufficiency determination of Appellant's convictions. We also note Appellant's crime of rape against a child under the age of 12 was charged to have occurred between on or about 11 October 2016 (approximately when Appellant arrived in Italy) and on or about 27 March 2018 (when AFOSI interviewed Appellant).

[10] *United States v. Care*, 40 C.M.R. 247 (C.M.A. 1969).

things with him, and spoke with him as frequently as she could. She also permitted WD to talk with him as much as she could. In December 2018, Appellant visited HD and WD for the holidays. HD recalled that they were "actually happy, like, things were great. We had a blast together. I thought everything was good." She stated she was sad and crying when Appellant returned to Italy. HD said she still trusted Appellant with their young daughter at this time, despite having seen the child pornography on his computer. However, unbeknownst to HD at that time, the investigation revealed that Appellant had multiple other digital devices containing obscene images of children engaged in sexually explicit conduct.

HD testified things changed on 28 January 2019, shortly after WD's fourth birthday. WD made an unprompted utterance of what Appellant did to her when they were living in Italy. As HD described, HD and WD were residing with HD's grandparents. The allegation came to light while she and WD were going through their normal bedtime routine. They were playing a game on her phone called Radial, which created tapestry-type signs. WD started to giggle at one point and said that one of the shapes looked "like Daddy's pee-pee." When trial counsel asked HD what happened next, HD responded:

> I asked her what - - how did she know what Daddy's pee-pee looks like. And she said "Daddy put his pee-pee in my mouth the last time we were in Italy." And then I asked her what - - "Well what do you mean?" And she said, "Well, the last time we were in Italy, Daddy put his pee-pee in my mouth, and I spit into a towel." And I asked her where I was and she said I was in the shower. And [I asked her] where it happened, she said "In yours and Daddy's room."

HD further testified that she was in shock and was having a difficult time with what she heard. HD then took WD to her grandparent's bedroom where WD repeated to her great-grandparents what she had told HD. JC, HD's grandfather, testified that at first, he only heard a portion of what WD said, including, "Daddy pee-pee in my mouth, and something about balls." JC then asked WD to repeat herself, and WD responded "when we were [in Italy], [HD was] taking a shower, Daddy put his pee-pee in my mouth. He pushed his balls against my face, and I threw up on a towel." HD testified that WD did not seem confused about whose penis was in her mouth, or when, or where it happened. According to HD, the only thing WD was confused about "was whether she did something wrong or not." HD stated she did not report Appellant that night because she "wanted to sleep on it" because "[t]here was a lot to consider." HD reported the allegation the next day.

After HD reported the incident, WD met with BL, a forensic interviewer with the Children's Advocacy Center located in the county where HD's grandparents resided. WD explained to BL what Appellant did to her in Italy during a video-recorded interview. BL stated that WD was able to discern what constituted a truth and what constituted a lie when prompted with hypothetical scenarios. BL testified that WD was also able to discern the differences in the questions that she asked her, which is evidenced by the fact that WD denied that anyone ever touched her chest. BL further testified that when she asked WD if anyone made her touch their private parts, WD did not respond at first and tried to change the subject, but went on to state that she did not want to talk about the bad stuff. BL recalled WD eventually told her that "daddy put his pee-pee in my mouth, and I threw up in a towel." WD described her "throw up" as white in color.

Significantly, WD also physically demonstrated what happened to her during the interview and on her own accord. WD used her hands and body to demonstrate Appellant's actions. When BL asked WD, "[W]here were daddy's hands when he put his pee-pee in your mouth?" WD replied by saying, "[H]e didn't put his own hands on it," then she indicated towards her own groin area and put her hand under her own chin, demonstrating that Appellant had lifted her chin to put his penis in her mouth. The entire recorded interview was played for the members during trial.[11]

Under oath at trial, WD also detailed Appellant's actions. Specifically, trial counsel asked WD, "Tell me what daddy did with his pee-pee." WD testified, "[Appellant] put it in my mouth . . . [a]nd then I - - and then I threwed up it, the white stuff in a white towel." When asked what "daddy's pee-pee" looked like, WD demonstrated with her hands, then responded, "[H]e wanted me to put it in my mouth." She described the stuff that came out of "daddy's pee-pee" as white and tasting like "throw up" and stated it went in her mouth and she spit it in a towel. She continued by stating the white stuff that went in her mouth did not taste good and that "[i]t came out of this hole," while also demonstrating her response. She also described this event as occurring "next to daddy's and my mom's bed." Following trial defense counsel's cross-examination of WD, and pursuant to a member's question, the military judge asked, "[WD], one more question. Did you ever see Daddy do anything to Mommy with his pee-pee?" To which WD responded, "Nope."

At trial the Defense called Special Agent (SA) IP, the case agent in Appellant's case. Trial defense counsel, *inter alia*, explored the possibility that HD had coached WD to say that she was sexually assaulted. SA IP testified the investigation did not reveal that HD provided WD with information to support

---

[11] The recorded interview was approximately 20 minutes long.

her allegation. SA IP also testified that WD "didn't look like she was coached" and "wasn't behaving like she had been coached." SA IP also stated on cross-examination that the AFOSI investigation did not reveal WD had been exposed to any pornography or obscene cartoons. She also confirmed that the investigation did not reveal WD had been exposed to the secretion of semen from any other source. Finally, she confirmed that HD was unwilling to participate in the investigation and there was no reason to believe that anyone told WD what to say during the investigation or Appellant's court-martial.

The Defense also called Dr. JY, who was recognized as an expert in the field of forensic psychology. Dr. JY testified concerning possible memory contamination, and the typical protocol for a child forensic interview—such as developing rapport, asking open-ended questions, and assessing cognitive ability. Dr. JY concluded, after reviewing DL's interview of WD, that WD was difficult to interview. He stated that DL had taken some "shortcuts" with rapport building due to WD's age which made accuracy of WD's disclosure a "toss-up." On cross-examination, Dr. JY agreed all the questions that DL posed to WD were open-ended questions that did not suggest an answer or conclusion. He further agreed that WD did not hesitate to challenge false information and that she made "on-the-spot corrections to information given to her" by DL. Dr. JY testified WD also gave an unprompted physical demonstration during the interview of how Appellant moved his penis in her mouth and further agreed that the question did not require WD to demonstrate a response. Finally, Dr. JY agreed that there was no evidence that WD was confused about who sexually assaulted her, what was done to her, where the assault occurred, or how Appellant committed the assault.

The panel of officer members found Appellant guilty of one specification each of rape and sexual abuse of a child.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

Appellant contends his convictions of rape and sexual abuse of a child are both legally and factually insufficient. Specifically, Appellant takes issue with WD's testimony, the manner in which the pretrial interviews were conducted, and whether WD was coached or influenced by adults. He also generally claims that the investigators were biased. Appellant asks us to set aside the findings and sentence. We disagree with Appellant's contentions and find no relief is warranted.

#### 1. Law

Issues of legal and factual sufficiency are reviewed de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). "Our assessment of legal and

factual sufficiency is limited to evidence produced at trial." *United States v. Rodela*, 82 M.J. 521, 525 (A.F. Ct. Crim. App. 2021) (citing *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993)), *rev. denied*, No. 22-0111, 2022 CAAF LEXIS 278 (C.A.A.F. 12 Apr. 2022).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (alteration in original) (citation omitted). The test for legal sufficiency "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Unites States v. Oliver*, 70 M.J. 64, 68 (C.A.A.F. 2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1973)).

"The test for factual sufficiency is 'whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses,' [this] court is 'convinced of the [appellant]'s guilt beyond a reasonable doubt.'" *United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F. 2000) (quoting *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987)). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399). The term "reasonable doubt" does not mean evidence free from conflict. *See Lips*, 22 M.J. at 684. This court's review of the factual sufficiency of evidence for findings is limited to the evidence admitted at trial. *See* Article 66(d), UCMJ; *United States v. Beatty*, 64 M.J. 456, 458 (C.A.A.F. 2007) (citations omitted).

Appellant was convicted of rape of a child in violation of Article 120b(a), UCMJ, 10 U.S.C. § 920b(a), which required the Government to prove two elements beyond a reasonable doubt: (1) Appellant committed a sexual act upon WD by penetrating her mouth with his penis; and (2) that WD had not attained

the age of 12 years at the time of the sexual act. *See* 2016 *MCM*, pt. IV, ¶ 45b.b.(1)(a).

Appellant was also convicted of sexual abuse of a child in violation of Article 120b(c), UCMJ, 10 U.S.C. § 920b(c), which required the Government to prove the following elements beyond a reasonable doubt: (1) Appellant committed a sexual contact upon WD by causing her to touch his genitalia; and (2) Appellant did so with the intent to gratify his sexual desire. *See* 2016 *MCM*, pt. IV, ¶ 45b.b.(4)(a). As charged in this case, the Government also had to prove that WD had not attained the age of 12 years.

### 2. Analysis

#### a. The Government's Case

The Government introduced convincing evidence of Appellant's guilt. Most significantly, the evidence demonstrated that WD consistently described and demonstrated, from her initial unprompted utterance to her in-court testimony, how Appellant committed the act of rape of a child by penetrating her mouth with his penis, and committed the act of sexual abuse of a child by causing her to touch his genitalia. She clearly stated these offenses took place in her parents' bedroom while the family was living in Italy. The evidence also demonstrated that the offenses occurred between October 2016 and March 2018, when WD was approximately 3 years old.

Specifically, during direct examination, WD clearly and in detail described when, where, and how Appellant performed a sexual act on her. The Government powerfully reinforced her testimony with the testimony of HD, who described in detail WD's spontaneous outcry when they were playing with a phone application before bed. HD clearly described that WD told her "the last time we were in Italy, Daddy put his pee-pee in my mouth, and I spit in a towel." WD's description of the offenses was also reinforced by testimony from WD's great-grandfather, JC, and testimony from the forensic interviewer, BL. JC testified WD told him "when we were [in Italy] . . . Daddy put his pee-pee in my mouth. He pushed his balls against my face, and I threw up on a towel." BL testified WD told her that "Daddy put his pee-pee in my mouth, and I threw up in a towel." WD also described to BL that the color of her "throw up" was white and it tasted bad.

In addition, HD provided testimony concerning Appellant's possession of child pornography and that Appellant had stated to her that he found the images arousing, refused to confirm that he would not touch a child or a little girl, and admitted he "couldn't stop looking at little girls." HD also described how she refused to be involved with the AFOSI investigation concerning the child pornography, and how WD's unprompted utterance came at a time when HD was excited about keeping her family together and moving on.

### b. Appellant's Claims of Reasonable Doubt

Appellant raises a number of arguments as to why we should not be convinced of his guilt beyond a reasonable doubt. We address the three most significant of them below.

Appellant first contends there were inconsistencies in WD's testimony. Specifically, Appellant argues that WD provided different descriptions of the bedroom where she was sexually assaulted. Appellant points us to WD's statement during the forensic interview, where she described pictures of "flower, pink butterflies" on the wall. This description was contradicted by other evidence. Appellant also asks that we compare the above statement with WD's testimony during cross-examination, where she generally described the room as "[j]ust normal. Just like plain . . . It was just the same. Just plain." Appellant argues that these discrepancies alone are enough to support reasonable doubt. We are unpersuaded by Appellant's argument. Even if we were to assume that there were inconsistencies in her description of the bedroom where the rape and sexual abuse occurred, "[i]nconsistencies . . . are not uncommon when child abuse victims testify." *United States v. Cano*, 61 M.J. 74, 77 (C.A.A.F. 2005). We also note that "reasonable doubt" does not mean that the evidence must be free from conflict. *See Lips*, 22 M.J. at 684. Here, any inability to accurately describe her parents' bedroom where the rape and sexual abuse occurred does little to contradict WD's vivid description and consistent recollection of where and how the acts occurred, and in this court's opinion does not, in and of itself, equate to reasonable doubt.

Appellant next contends WD's forensic interview was tainted when the interviewer "coaxed information" from WD to support the charged offenses. However, this is contrary to the record that demonstrates BL asked open-ended questions allowing WD to explain in her own words what Appellant did to her during the recorded forensic interview. BL testified during trial and Appellant's trial defense counsel extensively cross-examined her on her interview techniques. Trial defense counsel specifically questioned BL regarding her use of leading questions, to which BL testified that she was careful in her questioning as to not suggest any information or preferred responses. The strongest evidence against Appellant's argument comes from the Defense's own expert witness, Dr. JY. Dr. JY agreed during his testimony that all of the questions asked of WD during the forensic interview were open-ended questions. Additionally, he agreed there was no evidence that WD was confused regarding the details of the sexual assault. We are not persuaded that this evidence leads to reasonable doubt.

Appellant also contends WD was coached and influenced by exposure to age-inappropriate information prior to trial. Appellant alleges that WD could have made up the sexual assault because she could have seen Appellant having

sex with HD. This argument is not supported by the record. First, WD clearly stated on the record that she had not witnessed Appellant doing anything to HD with his "pee-pee." Additionally, in response to questions posed by trial defense counsel, SA IP testified that she had no reason to believe that WD had been exposed to any child pornography or obscene cartoons, and that "[WD] didn't look like she was coached." On this point, we note that there is also no evidence in the record that HD had a motive to coach her daughter. Rather, the evidence adduced at trial indicated that HD stayed with her husband even after he disclosed his habit of viewing child pornography. HD further testified she loved Appellant and was looking forward to putting the investigation behind them and being a family. Most compelling is HD's reluctance to participate with the law enforcement investigation. In sum, there was no evidence that WD was coached in preparation for her forensic interview.

Finally, Appellant contends his convictions were the product of a biased investigation. Specifically, Appellant contends that both HD and an investigator from Child Protective Services, ME, were biased against him. Having already discussed HD's potential bias or lack thereof above, we focus our attention on ME's involvement. ME interviewed WD shortly after WD was diagnosed with herpes. Generally, ME was investigating the possibility that WD had been sexually abused. Appellant now argues that ME was biased because she referenced WD's herpes infection in her investigative report. We find the discussion regarding herpes irrelevant, as there was no evidence of herpes put into evidence, nor was it even remotely discussed in front of the members at trial. Interestingly, Appellant called ME as a Defense witness at trial. ME testified that when she interviewed WD, prior to WD's outcry, that WD denied any sexual abuse. This information is very favorable to Appellant. If ME was harboring any bias towards Appellant, no evidence of such was brought to light during the trial. We find Appellant's contention that the investigation was biased is not supported by the record.

### c. Conclusion

Viewing the evidence in the light most favorable to the Prosecution, a rational trier of fact could have found the essential elements of rape and sexual abuse of a child beyond a reasonable doubt. *See Robinson*, 77 M.J. at 297−98. Furthermore, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are ourselves convinced of Appellant's guilt beyond a reasonable doubt. *See Reed*, 54 M.J. at 41 (quoting *Turner*, 25 M.J. at 325).

## B. Expert Testimony on Future Impact to Victim

Appellant argues the military judge erred in permitting expert testimony during presentencing proceedings concerning the future impact the offenses

would have on WD. Specifically, Appellant contends that the testimony did not qualify as evidence in aggravation under Rule for Courts-Martial (R.C.M.) 1001(b)(4). Additionally, Appellant takes issue with the military judge's finding that the probative value of this evidence was not substantially outweighed by the risk of unfair prejudice. Appellant asks us to set aside the sentence. We find no error and no relief warranted.

### 1. Additional Background

During an Article 39(a), UCMJ, 10 U.S.C. § 839(a), session outside the presence of members, trial counsel informed the court that the Government would call Dr. EB to adduce expert testimony during presentencing that would demonstrate WD was at risk for significant psychological trauma due to Appellant's offenses. Trial defense counsel objected, arguing that Dr. EB's testimony would rely on research with subjects who were not similarly situated with WD. Specifically, trial defense counsel noted that the research subjects' "median age at the onset of abuse was between seven and eight years," more than double WD's age at the time of the assault, and that the subjects suffered a median duration of two years of abuse, which was longer than the single incident encompassing the charged offenses. Trial defense counsel also argued that 70 percent of the abuse in those cases involved vaginal or anal penetration, whereas WD's case involved oral penetration.

During the Article 39(a), UCMJ, session, the military judge questioned Dr. EB in order to resolve the objections. Dr. EB generally stated her testimony would be related to Appellant's convictions based on the research trial defense counsel referenced. Dr. EB testified three factors cited by the research were present in WD's case and indicated WD was at a greater risk for future psychological harm: (1) the abuser was a father or father figure; (2) oral, anal, or vaginal penetration occurred; and (3) WD was under 8 years old at the time of abuse. Dr. EB confirmed for the military judge that she concluded the three factors applied to Appellant's case based on evidence adduced during the court-martial, which she observed. She did not quantify how much of a greater risk she believed WD faced. On cross-examination, trial defense counsel pointed out how the victims in the underlying research studies differed from WD. Dr. EB responded that the articles used to inform her opinions in this case discussed 20 to 30 different studies, and that she would only "rely on parts of the articles that are relevant to [Appellant's] case."

After the questioning of Dr. EB, the military judge ruled that Dr. EB would be allowed to testify about "any aggravating circumstances . . . directly relating to or resulting from the offenses for which [Appellant] has been found guilty. This rule extends to the potential future impacts on this victim." He further

found that trial defense counsel had shown the ability "to extract equally probative testimony from [Dr. EB]." The military judge also conducted a Mil. R. Evid. 403 balancing test and found

> the potential testimony of [Dr. EB] to substantially outweigh the risk of prejudice to the accused, undue delay, and confusing the issues for the members. Especially, in light of [trial] defense counsel's abilities and knowledge in this field, as well as, the [D]efense's own access to a forensic psychologist.

The military judge later restated his ruling on the record:

> With regards to Dr. [EB]'s proposed testimony at the time in my last decision: trial counsel may present evidence to any aggravating circumstances directly relating to or resulting from the offenses of which [Appellant] has been found guilty. "Directly relating or resulting from" not only refers to past events, but potential future impact as a result of the crime on the victim.

> The question here is whether [Appellant]'s misconduct could lead to future impact on [WD], as described in Dr. [EB]'s testimony. And this court finds it can. This court finds a direct link between [Appellant]'s offenses and [WD], specifically, in Dr. [EB]'s testimony regarding potential future impact of those acts on [WD]. This evidence is clearly relevant, directly related to, and resulted from [Appellant]'s acts.

> Furthermore, the probative value is not substantially outweighed by undue prejudice. The relevance of Dr. [EB]'s testimony, specifically, that of the impact of the father being the perpetrator of sexual abuse, the penetrative nature of the offense, and the young age [of the victim], that is, under the age of eight, is significant, given Dr. [EB]'s knowledge, skills and experience, and the facts and circumstances before this court-martial.

When presentencing resumed, the Government called Dr. EB as a witness. During her testimony Dr. EB was recognized as an expert in the fields of clinical and forensic psychology. At this point, the military judge instructed the members that they were "not required to accept the testimony of an expert witness or give it more weight than the testimony of an ordinary witness." Dr. EB then gave examples of short-term effects that a child sexual abuse victim may experience such as "depression symptoms, anxiety symptoms, PTSD [post-traumatic stress disorder], low self-esteem, self-harm . . . substance abuse, sexual promiscuity, academic difficulties, as well as behavior and conduct problems." She also testified about family problems that may arise from child sexual abuse and the specific effects upon preschool-aged victims.

Dr. EB further testified child sexual abuse victims were at risk of suffering various long-term effects. These included depression, PTSD, suicide attempts, marital problems stemming from less marital and sexual satisfaction, higher rates of re-victimization, substance abuse, and medical disorders like cardio-pulmonary disorders, and gastro-intestinal disorders. Dr. EB explained the risk of negative effects is greater where the father is the abuser, the abuse involves penetration, or when the victim is under 8 years old. She also noted that the duration of abuse can increase the likelihood of the negative outcomes, however, she also acknowledged that there was no evidence that there was a "longer duration of abuse" in WD's case. She concluded WD was at "higher risk" of exhibiting long-term effects later in her life as a result of the assault.

On cross-examination, trial defense counsel adduced testimony that not every child would be affected in the same way and that there were several factors associated with "greater negative outcomes" that were not present in WD's case. Dr. EB admitted that she had not personally evaluated WD and could not say that WD would, in fact, experience any of the aforementioned negative outcomes.

**2. Law**

We review a military judge's decision to admit or exclude evidence, including expert testimony, for an abuse of discretion. *See United States v. Hutchins*, 78 M.J. 437, 444 (C.A.A.F. 2019); *United States v. Billings*, 61 M.J. 163, 166 (C.A.A.F. 2005).

Military judges abuse their discretion when their "factual findings are clearly erroneous, view of law is erroneous, or decision is outside the range of reasonable choices." *Hutchins*, 78 M.J. at 444 (citations omitted). To prevail under this claim of error, an appellant must show "more than a mere difference of opinion," he must show the military judge's decision was "arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *United States v. McElhaney*, 54 M.J. 120, 130 (C.A.A.F. 2000) (citation omitted).

Mil. R. Evid. 702 prescribes:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Pursuant to Mil. R. Evid. 702, an expert may "testify in the form of an opinion or otherwise." The expert's opinion may be based on facts or data the expert has either personally observed or has been made aware of. Mil. R. Evid 703.

In the Government's sentencing case in aggravation, trial counsel may introduce evidence of "aggravating circumstances directly relating to or resulting from the offenses of which the accused has been found guilty." R.C.M. 1001(b)(4). Such evidence in aggravation may include "evidence of financial, social, psychological, and medical impact on or cost to any person . . . who was the victim of an offense committed by the accused . . . ." *Id.*

As this court has previously stated: "[t]he purpose of R.C.M. 1001(b)(4) is to provide the sentencing authority with information about the consequences and repercussions of an accused's offenses in order that a proper sentence can be discerned." *United States v. Anderson*, 60 M.J. 548, 556 (A.F. Ct. Crim. App. 2004). This evidence naturally includes evidence that a victim "may develop psychological or behavioral problems" in the future as a direct result of an accused's offenses. *Id.*

In determining whether evidence admitted in aggravation is "directly related" to the offenses of which an appellant was convicted, we assess whether the evidence is both direct and "closely related in time, type, and/or often outcome, to the convicted crime." *United States v. Hardison*, 64 M.J. 279, 281–82 (C.A.A.F. 2007). "Although the relationship to the appellant's offenses must be 'direct,' there is no requirement that the impact be limited to matters that have already occurred." *Anderson*, 60 M.J. at 556. It is well "accepted that impact evidence can include well-established prospective impact as well." *Id.*

Even when evidence qualifies for admission under R.C.M. 1001(b)(4), its probative value must still be weighed against its prejudicial impact under Mil. R. Evid. 403. *Hardison*, 64 M.J. at 281. Mil. R. Evid. 403 states: "The military judge may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following:  unfair prejudice, confusing the issues, misleading the members, undue delay, wasting time, or needlessly presenting cumulative evidence." In applying the Mil. R. Evid. 403 balancing test, military judges enjoy "wide discretion." *United States v. Manns*, 54 M.J. 164, 166 (C.A.A.F. 2000) (citations omitted). However, we give less deference to military judges' decisions if they do not explain their analysis on the record, and we give military judges no deference when they fail to conduct the analysis at all. *Id.*

"When there is error in the admission of sentencing evidence, the test for prejudice is whether the error substantially influenced the adjudged sentence."

*United States v. Barker*, 77 M.J. 377, 384 (C.A.A.F. 2018) (internal quotation marks omitted) (quoting *United States v. Sanders*, 67 M.J. 344, 346 (C.A.A.F. 2009)). We consider four factors to determine whether an error had a substantial influence on the sentence. Those factors include "(1) the strength of the Government's case; (2) the strength of the defense case; (3) the materiality of the evidence in question; and (4) the quality of the evidence in question." *Id.* (internal quotation marks omitted and citations omitted). "An error is more likely to be prejudicial if the fact was not already obvious from the other evidence presented at trial and would have provided new ammunition against an appellant." *Id.* (citing *United States v. Harrow*, 65 M.J. 190, 200 (C.A.A.F. 2007)).

### 3. Analysis

Here, the military judge did not abuse his discretion when he determined that Dr. EB's testimony would assist the trier of fact to understand the potential future harm WD could suffer as a child-victim of sexual abuse, and that such testimony was proper evidence in aggravation. *See United States v. Stark*, 30 M.J. 328, 329–30 (C.M.A. 1990) (expert testimony that child victims of sexual abuse were "at a higher risk" of suffering from long-term effects of the abuse); *United States v. Hammond*, 17 M.J. 218, 219–21 (C.M.A. 1984) (expert testimony was admissible regarding evidence of the general effects of rape trauma even though the witness had neither interviewed nor counseled the victim).

In this case, Dr. EB, an expert in the fields of clinical and forensic psychology, testified that WD was at a greater risk of experiencing psychological harm in the future. She based her opinion on three factors that she found applicable to Appellant's court-martial which she personally observed. Consistent with her statements in the Article 39(a), UCMJ, hearing, Dr. EB based her testimony on research applicable to the evidence presented during findings, and her opinions were limited to the possible negative outcomes that WD could later face.

We find that there was a sufficient basis in this case for the military judge to allow Dr. EB's expert testimony because Dr. EB had observed the entire court-martial, which included watching WD's testimony, and viewing WD's recorded forensic interview. Also, as in *Stark*, trial defense counsel in this case conducted a vigorous cross-examination of Dr. EB, during which Dr. EB agreed that not all children would react the same way, and that there were several factors not present in WD's case that could "predict greater negative outcomes." Dr. EB also acknowledged on cross-examination that she had not personally evaluated WD and could not say that WD would, in fact, experience any negative outcomes as a result of the sexual abuse she suffered.

We also find that the military judge conducted sufficient analysis under Mil. R. Evid. 403 to make his determination. The military judge found Dr. EB's testimony to be relevant, and that the probative value was significant given "Dr. [EB]'s knowledge skills and experience, and the facts and circumstances before this court-martial" that were present in the research. In contrast, the military judge found the risk of unfair prejudice to be low due to trial defense counsel's ability to effectively cross-examine Dr. EB and adduce probative evidence to challenge her testimony. Based on these findings the military judge determined that the probative value of Dr. EB's testimony substantially outweighed the risk of prejudice.

In this case, Appellant has not demonstrated that the military judge's decision was "arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *McElhaney*, 54 M.J. at 130. Rather, the record demonstrates that the military judge correctly applied the facts to the law, conducted the required Mil. R. Evid. 403 balancing test, and properly instructed the members, prior to receiving the evidence, on how to consider Dr. EB's testimony. *See Stark*, 30 M.J. at 330. We therefore conclude that Dr. EB's testimony on the possible psychological impact of Appellant's crime on WD was properly admitted as expert testimony in aggravation.

Assuming *arguendo* that the military judge erred in admitting the testimony of Dr. EB, we find Appellant suffered no prejudice. Applying the *Barker* factors, we find the Government's case was strong. We also find that Dr. EB's testimony was insubstantial as compared to the far more aggravating evidence already before the members concerning the circumstances and details of Appellant's criminal behavior. Additionally, we find that trial defense counsel's effective cross-examination of Dr. EB sufficiently negated the risk that Dr. EB's testimony had a substantial influence on the adjudged sentence. Finally, the military judge instructed the panel that they did not have to accept Dr. EB's testimony or give it greater weight than any other evidence. We presume the members followed the military judge's instructions. *United States v. Custis*, 65 M.J. 366, 372 (C.A.A.F. 2007). Therefore, we conclude Dr. EB's testimony did not "substantially influence the adjudged sentence." *Barker*, 77 M.J. at 384.

## C. Double Jeopardy

Appellant contends that the military judge erred by not dismissing the specification alleging possession of obscene cartoons on the grounds that Appellant's prosecution for this offense was in violation of the Fifth Amendment and the prohibition against double jeopardy contained in Article 44, UCMJ. Appellant asks this court to set aside the findings and sentence. We are not persuaded by Appellant's contention and find no relief is warranted.

### 1. Additional Background

#### a. Appellant's First Court-Martial

Between 29 October and 2 November 2018, Appellant was tried by a military judge at a general court-martial for three specifications alleging that Appellant (1) knowingly and wrongfully possessed child pornography, (2) knowingly and wrongfully viewed child pornography, and (3) knowingly and wrongfully possessed obscene cartoons under 18 U.S.C. § 1466A(b)(1), all in violation of Article 134, UCMJ.

During closing argument at Appellant's first court-martial, trial defense counsel argued that the specification related to the obscene cartoons was erroneously drafted. The military judge, *sua sponte*, stated that she considered the argument to be a motion to dismiss, even though trial defense counsel did not characterize it as such. The military judge requested the parties draft written briefs on the issue. After receiving the written briefs and hearing argument but before entering any findings, the military judge dismissed the specification alleging possession of obscene cartoons for lack of jurisdiction. Subsequently, the military judge acquitted Appellant of the remaining two specifications.

#### b. Appellant's Second Court-Martial

At Appellant's second court-martial, which we now review, the Government charged Appellant with wrongful possession of obscene cartoons in violation of Article 134, UCMJ. On 8 May 2019, the Defense moved to dismiss the specification, arguing that Appellant was now charged in violation of the Fifth Amendment's prohibition against double jeopardy.[12] On 15 May 2019, the Government filed a response, and on 20 May 2019, a hearing was held pursuant to Article 39(a), UCMJ, at which time the motion was litigated. On 13 June 2019, the military judge issued his ruling and denied the defense motion to dismiss.

In his written ruling, the military judge found Appellant was currently charged with one specification that alleged he wrongfully possessed obscene cartoons in violation of Article 134, UCMJ. The specification alleged that Appellant:

> did, at or near Italy, between on or about 11 October 2016 and on or about 27 March 2018, knowingly and wrongfully possess obscene cartoons, such conduct being of a nature to bring discredit upon the armed forces.

---

[12] Trial defense counsel explicitly stated that he did not believe the double jeopardy issue was waived for appellate review despite Appellant's plea of guilty to the specification.

The military judge also found Appellant was previously tried by court-martial for knowing and wrongful possession of obscene cartoons in violation Article 134, UCMJ. Specifically, the judge found the specification from Appellant's first court-martial alleged that he:

> did, at or near Italy, between on or about 11 October 2016 and on or about 27 March 2018, knowingly and wrongfully possess obscene cartoons, to wit: visual depictions of minors engaging in sexually explicit conduct, and that said visual depictions were transported in foreign commerce by computer, in violation of 18 U.S. Code Section 1466A(b)(1), an offense not capital.

During the motions hearing, the military judge asked trial defense counsel to clarify the trial judge's ruling at the first court-martial. The following discussion ensued:

> Q [Military Judge]: What was the finding, though?
>
> A [Trial Defense Counsel]: The finding was lack of jurisdiction.
>
> Q: Okay. So, there was no finding entered as to the - -
>
> A: Yes, sir. It was dismissed before findings.

The military judge then concluded that both specifications captured the same course of conduct, although they were charged under different provisions of Article 134, UCMJ. The military judge also found the trial judge in Appellant's first court-martial did not enter a finding for the possession of obscene cartoons and that the specification was dismissed for lack of jurisdiction. The military judge also stated the evidence was "uncontroverted" that the trial judge for the first court-martial did not consider any of the evidence supporting the dismissed specification in reaching the findings on the other specifications. The military judge explained his conclusion was supported by the fact that the images alleged in the other specifications were contained on Appellant's cell phone and the obscene cartoons in the dismissed specification were contained on Appellant's laptops and USB drive.

Ultimately, the military judge concluded that while jeopardy had attached in Appellant's first court-martial when evidence on the merits was admitted, that jeopardy was later severed when the military judge dismissed the specification on jurisdictional grounds prior to any final judgment on the specification. The military judge then denied the Defense motion to dismiss. Subsequently, Appellant filed a petition with this court requesting a writ of mandamus to set aside the military judge's denial of the defense motion and to order the obscene-cartoon specification dismissed with prejudice. This court denied the petition. *See In re Driskill*, Misc. Dkt. No. 2019-03, 2019 CCA LEXIS 281, at *3–4 (A.F. Ct. Crim. App. 2 Jul. 2019).

**2. Law**

"Whether a prosecution violates double jeopardy is a question of law" that we review de novo. *United States v. Rice*, 80 M.J. 36, 40 (C.A.A.F. 2020). Questions of jurisdiction are reviewed de novo. *See United States v. Kuemmerle*, 67 M.J. 141, 143 (C.A.A.F. 2009).

The Fifth Amendment provides that no person shall "be subject, for the same offence, to be twice put in jeopardy of life or limb." U.S. CONST. amend. V. The prohibition against double jeopardy provides protection against multiple punishments and successive prosecutions for the same misconduct. *See Brown v. Ohio*, 432 U.S. 161, 165 (1977). One of the purposes underlying the prohibition on double jeopardy is "to protect the integrity of a final judgment." *United States v. Scott*, 437 U.S. 82, 92 (1978). Another purpose is to ensure that the Government, "with all its resources and power," is not "allowed to make repeated attempts to convict an individual" for an offense, "thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty." *Green v. United States*, 355 U.S. 184, 187–88 (1957).

The double jeopardy clause applies to military personnel through Article 44(a), UCMJ, 10 U.S.C. § 844(a), which provides that "[n]o person may, without his consent, be tried a second time for the same offense." "Article 44, UCMJ, does not, however, offer broader protections than granted by the Constitution." *United States v. McClain*, 65 M.J. 894, 899 (A. Ct. Crim. App. 2008) (citations omitted).

The analysis of whether a prosecution is barred by double jeopardy includes two temporal components, "first, that jeopardy attaches, and second, that it terminates." *United States v. McMurrin*, 72 M.J. 697, 704 (N.M. Ct. Crim. App. 2013). "In the case of a jury trial, jeopardy attaches when a jury is empaneled and sworn. In a nonjury trial, jeopardy attaches when the court begins to hear evidence." *Serfass v. United States*, 420 U.S. 377, 388 (1975). "[T]he conclusion that jeopardy has attached begins, rather than ends, the inquiry as to whether the Double Jeopardy Clause bars retrial." *Id.* at 390 (quoting *Illinois v. Somerville*, 410 U.S. 458, 467 (1973)). Jeopardy can terminate when there is no final judgment on the matter, when a charge is withdrawn and dismissed without prejudice upon a defense motion, even after the presentation of evidence. *See, e.g.*, *Lee v. United States*, 432 U.S. 23 (1977); *United States v. Dinitz*, 424 U.S. 600 (1976).

"No court-martial proceeding which lacked jurisdiction to try the accused for the offense is a trial in the sense of the rule." R.C.M. 907(b)(2)(C)(iv). "[B]efore a person can be said to have been put in jeopardy of life or limb the

court in which he was acquitted or convicted must have had jurisdiction to try him for the offense charged." *Grafton v. United States*, 206 U.S. 333, 345 (1907).

### 3. Analysis

At the first court-martial, a military judge-alone trial, Appellant was arraigned and entered pleas, and evidence on the merits was admitted. Therefore, we agree with the military judge that jeopardy had clearly attached. We also agree with the military judge that jeopardy terminated when the specification alleging that Appellant possessed obscene cartoons was dismissed without prejudice. We see no evidence of bad faith on behalf of the judge or trial counsel in this case. *See Lee*, 432 U.S. at 33 (the Double Jeopardy Clause will not bar reprosecution absent bad faith on behalf of judge or prosecutor). In fact, it was Appellant's counsel who raised the issue during argument which eventually led to dismissal of the specification. It is also clear the specification was dismissed for lack of jurisdiction—grounds wholly unrelated to Appellant's guilt or innocence—and that the dismissal came before Appellant was acquitted of the remaining specifications. Therefore, we conclude that there was no final judgment on whether Appellant wrongfully possessed obscene cartoons, and that no constitutional or Article 44(a), UCMJ, violation occurred in this case.

### D. Providence of Guilty Plea

Appellant claims his guilty plea for possessing obscene cartoons was improvident because the cartoons were not obscene. Specifically, Appellant argues that "some of the characters [in the cartoons] are actually hundreds of years old even though they appear young" and thus do not depict adults and children engaged in sexually explicit behavior. We disagree, and find no relief is warranted.

### 1. Additional Background

As part of his guilty plea, Appellant entered into a PTA in which he waived all waivable motions as pertaining to the obscene-cartoons specification. Appellant also voluntarily entered into a stipulation of fact, where he agreed to the admissibility of 150 cartoon images that depicted adult figures engaged in sexually explicit conduct with what appear to be young children. Specifically, in the stipulation of fact, Appellant agreed that "[t]he cartoons were obscene in that their sexual content was patently offensive in light of community standards," and that the cartoons lacked any "serious literary, artistic, political, or scientific value."

The military judge asked Appellant during the guilty plea inquiry if "there [was] anything in the stipulation [of fact] that [he did] not wish to admit [was] true?" Appellant responded "No, Your Honor."

When describing this offense, Appellant stated, "I wrongfully possessed obscene cartoons. . . . I reviewed the cartoons on Prosecution Exhibit 1 [stipulation of fact] and agree that they meet the legal definition of obscenity because of what they depict." The military judge then asked Appellant to describe why the cartoons were obscene. Appellant responded, "[B]ecause they depict drawings of characters that are smaller and childlike in nature engaging in sex acts . . . ." Appellant further agreed the cartoons were "patently offensive."

**2. Law**

"A military judge's decision to accept a guilty plea is reviewed for an abuse of discretion." *United States v. Forbes*, 78 M.J. 279, 281 (C.A.A.F. 2019) (quoting *United States v. Eberle*, 44 M.J. 374, 375 (C.A.A.F. 1996)). In reviewing the providency of a plea, a military judge abuses his discretion only when there is "a substantial basis in law or fact for questioning the plea." *United States v. Inabinette*, 66 M.J. 320, 321–22 (C.A.A.F. 2008) (quoting *United States v. Prater*, 32 M.J. 433, 436 (C.M.A. 1991)). The military judge's legal conclusion about the providency of the plea is reviewed de novo. *United States v. Harris*, 61 M.J. 391, 398 (C.A.A.F. 2005).

"Once the military judge has accepted a plea as provident and has entered findings based on it, an appellate court will not reverse that finding and reject the plea unless it finds a substantial conflict between the plea and the accused's statements or other evidence of record." *United States v. Garcia*, 44 M.J. 496, 498 (C.A.A.F. 1996).

An appellant bears the burden of establishing that the record shows "a substantial basis in law or fact to question the plea." *United States v. Phillips*, 74 M.J. 20, 21–22 (C.A.A.F. 2015). "A 'mere possibility' of such a conflict is not a sufficient basis to overturn the trial results." *Garcia*, 44 M.J. at 498 (quoting *Prater*, 32 M.J. at 436).

Appellate courts will not speculate on the existence of facts that might invalidate a plea especially where the matter raised post-trial contradicts an appellant's express admission on the record. *See United States v. Johnson*, 42 M.J. 443, 445 (C.A.A.F. 1995).

"A guilty plea is provident if the facts elicited make out each element of the charged offense." *Harrow*, 65 M.J. at 205.

"'Indecent' is synonymous with 'obscene,' and such language is not afforded constitutional protection." *United States v. Moore*, 38 M.J. 490, 492 (C.M.A. 1994) (citing *United States v. French*, 31 M.J. 57, 59 (C.M.A. 1990)); *see also United States v. Meakin*, 78 M.J. 396, 401 (C.A.A.F. 2019).

"Indecent language" is defined as "that which is grossly offensive to modesty, decency, or propriety, or shocks the moral sense, because of its vulgar,

filthy, or disgusting nature, or its tendency to incite lustful thought." 2016 *MCM*, pt. IV, ¶ 89.c.

> The United States Supreme Court outlined "basic guidelines" for determining whether forms of expression amount to obscenity in *Miller v. California.* 413 U.S. 15, 24 (1973). These guidelines are: (a) whether "the work, taken as a whole, appeals to the prurient interest" when viewed through the lens of "the average person, applying contemporary community standards;" (b) "whether the work depicts or describes, in a patently offensive way, sexual conduct;" and (c) "whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value."

*United States v. White*, No. ACM 39917 (f rev), 2022 CCA LEXIS 344, at \*22–23 (A.F. Ct. Crim. App. 10 Jun. 2022) (unpub. op.) (citations omitted).

### 3. Analysis

At trial, the military judge conducted a comprehensive inquiry not just of Appellant's plea, but, *inter alia*, also of his right to counsel and the PTA and stipulation of fact that Appellant signed. After the military judge read the elements and definitions for wrongful possession of obscene cartoons, Appellant acknowledged that he understood the elements and definitions and that, when taken together, they accurately described his conduct. Appellant described the cartoons and why they were obscene in his own words. The military judge reviewed the stipulation of fact, including 150 cartoon images where a significant number of the images depicted adult figures engaged in sexually explicit conduct with what appear to be young children which Appellant averred was accurate. We conclude that the military judge did not abuse his discretion in accepting Appellant's plea and had no evident basis for rejecting it. Accordingly, we find Appellant's guilty plea was voluntary and provident.

### E. Trial Counsel's Closing Argument

Appellant claims that trial counsel committed prosecutorial misconduct during his findings argument by using evidence that was admitted under Mil. R. Evid. 404(b) for the purpose of showing that Appellant had the propensity to commit the charged crimes. Specifically, Appellant alleges trial counsel used evidence that Appellant possessed child pornography to show that he had the propensity to rape and sexually abuse his daughter. Appellant asks this court to set aside the findings and sentence. We disagree with Appellant's claims and find no relief is warranted.

### 1. Additional Background

As we noted above in section C, Appellant was previously acquitted of wrongfully possessing and viewing child pornography. During Appellant's current trial, trial defense counsel filed a motion to exclude any evidence of Appellant's alleged prior child pornography offenses. The military judge ruled HD could testify that Appellant had shown her child pornography, but that she could not detail the number of images or the images' content. At trial, the senior trial counsel asked HD if Appellant had shown her images of child pornography which she answered affirmatively. HD then testified about a conversation she had with Appellant regarding child pornography. She asked Appellant if he "got off on [child pornography]," and Appellant confirmed by stating, "Why does anybody look at pornography, [HD]?" HD also testified Appellant confessed to her that he started looking at child pornography to "help these children," but later "started getting turned on by it." HD asked Appellant if he would ever touch a child, and he responded, "I don't know, because I can't even stop looking at a picture."

At the conclusion of HD's testimony, the military judge issued the following instruction to the members:

> You've heard evidence that [Appellant] may have shown [HD] images of child pornography, and commented on his willingness to commit crimes similar to those in the images. You may consider this for the limited purpose of its tendency, if any, to determine whether [Appellant] had a motive to commit any of the charged offenses, as well as to prove that [Appellant] intended to commit the offense alleged in Specification 2 of the Additional Charge [sexual abuse of a child]. You may not consider this evidence for any other purpose. And you may not conclude from this evidence that [Appellant] is a bad person, or has general criminal tendencies and that he, therefore, committed the offenses charged.

During findings argument, trial counsel argued:

> [HD] described it as child pornography. And you know it is, because what was his response when she first found out about it, how did he describe why he started looking at these images? He said, "I just wanted to help these kids," or words to that effect. He wanted to help them? Well, the one thing we know from that is that they were real kids, because there's no helping cartoons. And so ultimately, members, you have to know exactly what this guy was into.

Trial counsel continued:

> W]hen he tells [HD]: I don't know [HD], I just can't stop looking at them or I can't even stop looking at them. You know what he was bound to do. You know if that's the line that he would draw, I will look at them but I will not offend, his answer is much different to his wife. And the cross-examination was he had been drinking. Yeah, some truth serum got it out. For sure. For sure. Some truth serum got us to understand exactly what his intent was, and what his motive has been all along. Absolutely he said that to her.

Trial counsel went on to argue that when Appellant sobered up the next day, he "change[d] the degree and timeline of his guilt." Trial counsel argued that Appellant's culpability changed "[b]ecause he has to hide from the very fact that every time he looks at these images he has the same arousal. And he has to hide from the very fact that he is motivated to do it himself."

Trial defense counsel did make objections to other statements in trial counsel's argument, but none pertaining to either the Mil R. Evid. 404(b) evidence or to any of the above-quoted arguments.

**2. Law**

"We review prosecutorial misconduct and improper argument de novo and where . . . no objection is made, we review for plain error." *United States v. Voorhees*, 79 M.J. 5, 9 (C.A.A.F. 2019) (citing *United States v. Andrews*, 77 M.J. 393, 398 (C.A.A.F. 2018)). "Plain error occurs when (1) there is error, (2) the error is plain or obvious, and (3) the error results in material prejudice to a substantial right of the accused." *United States v. Fletcher*, 62 M.J. 175, 179 (C.A.A.F. 2005) (citation omitted). The burden of proof under a plain error review is on the appellant. *See United States v. Bungert*, 62 M.J. 346, 348 (C.A.A.F. 2006).

"Improper argument is one facet of prosecutorial misconduct." *United States v. Sewell*, 76 M.J. 14, 18 (C.A.A.F. 2017). Prosecutorial misconduct occurs when trial counsel "oversteps the bounds of that propriety and fairness which should characterize the conduct of such an officer in the prosecution of a criminal offense." *Fletcher*, 62 M.J. at 178 (quoting *Berger v. United States*, 295 U.S. 78, 84 (1935)). Such conduct "can be generally defined as action or inaction by a prosecutor in violation of some legal norm or standard, *e.g.*, a constitutional provision, a statute, a Manual rule, or an applicable professional ethics canon." *United States v. Hornback*, 73 M.J. 155, 160 (C.A.A.F. 2014) (quoting *United States v. Meek*, 44 M.J. 1, 5 (C.A.A.F. 1996)).

"A prosecutorial comment must be examined in light of its context within the entire court-martial." *United States v. Carter*, 61 M.J. 30, 33 (C.A.A.F. 2005) (citation omitted). "When a trial counsel makes an improper argument

during findings, 'reversal is warranted only when the trial counsel's comments taken as a whole were so damaging that we cannot be confident that the members convicted the appellant on the basis of the evidence alone.'" *United States v. Norwood*, 81 M.J. 12, 19 (C.A.A.F. 2021) (quoting *Andrews*, 77 M.J. at 401–02). "We weigh three factors to determine whether trial counsel's improper arguments were prejudicial: '(1) the severity of the misconduct, (2) the measures adopted to cure the misconduct, and (3) the weight of the evidence supporting the conviction.'" *Andrews*, 77 M.J. at 402 (quoting *Fletcher*, 62 M.J. at 184).

"[T]he lack of a defense objection is 'some measure of the minimal impact of a prosecutor's improper comment.'" *United States v. Gilley*, 56 M.J. 113, 123 (C.A.A.F. 2001) (quoting *United States v. Carpenter*, 51 M.J. 393, 397 (C.A.A.F. 1999)).

### 3. Analysis

Because trial defense counsel did not object, we review for plain error. We are not persuaded by Appellant's argument that trial counsel used evidence admitted under Mil. R. Evid. 404(b) for the improper purpose of arguing Appellant had the propensity to commit the charged offenses. We find that trial counsel argued admitted evidence for the express purpose of showing Appellant's motive and intent. In support of his position that trial counsel misused the evidence, Appellant asks that we focus our attention on eight words spoken by trial counsel, "You know what he was bound to do." However, after review of trial counsel's entire argument, it is evident that trial counsel was not linking Appellant's alleged possession of child pornography to a propensity to commit rape or sexual abuse of a child. Rather, trial counsel reasoned that Appellant was discretely revealing his motive and intent to sexually assault a child because he could not reassure his wife that he would never touch a child sexually. We note the military judge had previously instructed the members that they could consider Appellant's comments to HD "for the limited purpose of its tendency, if any, to determine whether [Appellant] had a motive to commit any of the charged offenses." Therefore, we conclude that trial counsel properly argued evidence admitted for its limited permitted purpose and that there was no error plain or otherwise.

Even if we were to assume that TC's argument constituted plain or obvious error, Appellant would not be entitled to relief because he has failed to demonstrate prejudice. After considering the three factors set forth by the United States Court of Appeals for the Armed Forces in *Fletcher*, we conclude such an error did not materially prejudice Appellant's substantial rights. As to the first factor, we find the severity of the error to be slight. The fact that trial defense counsel did not object to any of these instances is some indication of their immateriality. *See Gilley*, 56 M.J. at 123. In addition, Appellant only points to

eight words in an otherwise lengthy findings argument. We find the first factor weighs in the Government's favor.

With regard to the second *Fletcher* factor, our review of the record finds that the military judge reiterated his instruction regarding the limited purpose for which the members could consider Appellant's alleged possession of child pornography at least three times. We note again that the military judge provided a limiting instruction once after the testimony was heard, once immediately before trial counsel argued, and once directly after the conclusion of trial counsel's argument. "Absent evidence to the contrary, this [c]ourt may presume that members follow a military judge's instructions." *United States v. Taylor*, 53 M.J. 195, 198 (C.A.A.F. 2000) (citations omitted); *see also Custis*, 65 M.J. at 372. Therefore, we find the second factor also weighs in the Government's favor.

Finally, as we noted above, we find the strength of the evidence significantly favors the Government. The Government presented a compelling case, including the testimony of WD, HD, and JC. In sum, we find no prospect that the allegedly erroneous argument—eight words—played any substantial role in the court members' findings. Therefore, the third factor also weighs in the Government's favor. After weighing the *Fletcher* factors together and considering trial counsel's arguments in context, we are confident the court members properly convicted Appellant on the basis of the evidence alone.

**F. Sentence Appropriateness**

Appellant contends his sentence to 40 years and 9 months of confinement is inappropriately severe. We agree.

This court "may affirm only . . . the sentence or such part or amount of the sentence, as it finds correct in law and fact and determines, on the basis of the entire record, should be approved." Article 66(d), UCMJ. We review sentence appropriateness de novo, employing "a sweeping Congressional mandate to ensure 'a fair and just punishment for every accused.'" *United States v. Baier*, 60 M.J. 382, 383–84 (C.A.A.F. 2005) (quoting *United States v. Bauerback*, 55 M.J. 501, 504 (A. Ct. Crim. App. 2001)). In determining whether a sentence should be approved, our authority is "not legality alone, but legality limited by appropriateness." *United States v. Nerad*, 69 M.J. 138, 141 (C.A.A.F. 2010) (citing *United States v. Atkins*, 23 C.M.R. 301, 303 (C.M.A. 1957)).

"We assess sentence appropriateness by considering the particular appellant, the nature and seriousness of the offense[s], the appellant's record of service, and all matters contained in the record of trial." *United States v. Anderson*, 67 M.J. 703, 705 (A.F. Ct. Crim. App. 2009) (per curiam) (citations omit-

ted). While we have great discretion in determining whether a sentence is appropriate, we are not authorized to engage in exercises of clemency. *See Nerad*, 69 M.J. at 146.

In conducting this review, we must also be sensitive to considerations of uniformity and even-handedness. *United States v. Sothen*, 54 M.J. 294, 296 (C.A.A.F. 2001) (citing *United States v. Lacy*, 50 M.J. 286, 287–88 (C.A.A.F. 1999)).

We have conducted a thorough review of Appellant's entire court-martial record, including his record of service. Our review of the trial record shows Appellant did not make an unsworn statement, and presented no evidence for the members' consideration before they determined his sentence. Additionally, our review of Appellant's service record shows that he joined the Air Force on 3 May 2016, served no deployments, served no remote tours, and did not have an enlisted performance report.

Here, we note that Appellant's misconduct is severe and that the maximum sentence Appellant faced included a term of confinement for life without parole and a dishonorable discharge.

Nonetheless, based on our collective experiences as judge advocates and appellate judges, and taking into account the principles of sentencing and the matters in aggravation, as balanced by the matters in mitigation, we conclude that Appellant's sentence to confinement for 40 years and 9 months is inappropriately severe. In making this determination, we are not engaging in an act of clemency; rather, we are fulfilling our duty under Article 66(d), UCMJ, to maintain uniformity and even-handedness of court-martial sentencing decisions. *See Sothen*, 54 M.J. at 296. Our decision is not made lightly and was the product of considerable reflection, deliberation, and debate. *See Lacy*, 50 M.J. at 288 (citing *United States v. Olinger*, 12 M.J. 458, 461 (C.M.A. 1982) ("Under Article 66(c), [UCMJ,] Congress has furthered the goal of uniformity in sentencing in a system that values individualized punishment by relying on the judges of the Courts of Criminal Appeals to utilize the experience distilled from years of practice in military law to determine whether, in light of the facts surrounding [the] accused's delict, his sentence was appropriate." (Alteration in original)); *see also United States v. Wacha*, 55 M.J. 266, 267 (C.A.A.F. 2001) (citing *United States v. Ballard*, 20 M.J. 282, 286 (C.M.A. 1985)) (affirming the importance of the "accumulated knowledge" of "experienced Court of Criminal Appeal judges" in assessing for sentence appropriateness). We conclude that a sentence of a dishonorable discharge, confinement for 30 years, forfeiture of all pay and allowances, and reduction to the grade of E-1 should be affirmed.

## III. CONCLUSION

We affirm only so much of the sentence that includes a dishonorable discharge, confinement for 30 years, forfeiture of all pay and allowances, and reduction to the grade of E-1. The findings as entered and sentence as reassessed are correct in law and fact and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings of guilty as entered, and the sentence as reassessed, are **AFFIRMED.**

MEGINLEY, Judge (dissenting):

Although Appellant did not specifically ask the military judge to instruct the members that a finding of guilty must be unanimous, and while it is unknown whether Appellant was convicted by a unanimous verdict, Appellant argues the Government could not prove beyond a reasonable doubt that the military judge's failure to instruct the panel that a guilty verdict must be unanimous was harmless. In *United States v. Westcott*, I found the appellant was denied equal protection under the law and would have set aside the findings without prejudice; our superior court has since denied review in that case. No. ACM 39936, 2022 CCA LEXIS 156, at *108 (A.F. Ct. Crim. App. 17 Mar. 2022) (Meginley, J., dissenting in part and in the result) (unpub. op.), *rev. denied*, No. 22-0206, 2022 CAAF LEXIS 522 (C.A.A.F. 21 Jul. 2022).

Nonetheless, in *United States v. Anderson*, the United States Court of Appeals for the Armed Forces (CAAF) granted the appellant's petition on the following issue:

> WHETHER APPELLANT WAS DEPRIVED OF HIS RIGHT TO A UNANIMOUS VERDICT AS GUARANTEED BY THE SIXTH AMENDMENT, THE FIFTH AMENDMENT'S DUE PROCESS CLAUSE, AND THE FIFTH AMENDMENT'S RIGHT TO EQUAL PROTECTION.

No. 22-0193, 2022 CAAF LEXIS 529 (C.A.A.F. 25 Jul. 2022). That same day, the CAAF also granted review in *United States v. Veerathanongdech* on the following issue:

> WHETHER THE MILITARY JUDGE'S FAILURE TO INSTRUCT THE PANEL THAT A GUILTY VERDICT MUST BE UNANIMOUS WAS HARMLESS BEYOND A REASONABLE DOUBT.

No. 22-0205, 2022 CAAF LEXIS 533 (C.A.A.F. 25 Jul. 2022).

I believe these two issues are encompassed within my dissent in *Westcott*. Therefore, although the CAAF denied review in *Westcott*, in light of these two grants by the CAAF, I maintain my position as articulated in *Westcott*, and find Appellant was denied equal protection under the law and would set aside the findings without prejudice.

FOR THE COURT

ANTHONY F. ROCK, Maj, USAF
Acting Clerk of the Court